UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X
CALVIN OLIVER TAI-FATT,                          :

                Plaintiff,                      :          OPINION AND ORDER
                                                       11 Civ. 9365 (GWG)
        -v.-                                    :

                                                      :
MICHAEL J. ASTRUE, Commissioner of
Social Security,                                 :

                Defendant.                      :
------------------------------------------------------------X

**GABRIEL W. GORENSTEIN, UNITED STATES MAGISTRATE JUDGE**

       Plaintiff Calvin Oliver Tai-Fatt brings this action pursuant to 42 U.S.C. § 405(g) to

obtain judicial review of the final decision of the Commissioner of Social Security

("Commissioner") denying his claim for disability insurance benefits.  The parties have cross-

moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil

Procedure.  For the reasons stated below, Tai-Fatt's motion is denied and the Commissioner's

motion is granted.[1]

I.       BACKGROUND

       A.       Tai-Fatt's Claim for Benefits and Procedural History

       Tai-Fatt filed an application for disability insurance benefits on March 4, 2003.  R.

67–69.[2]  Tai-Fatt claimed that he "became unable to work because of [his] disabling condition on

December 1, 1987," and that he is "still disabled."  R. 67.  On May 5, 2003, the Commissioner

---

[1] The parties have consented to having this matter decided by a United States Magistrate Judge
pursuant to 28 U.S.C. § 636(c).

[2] "R." refers to the page numbers of the administrative record, which is annexed to the
Commissioner's Answer, filed Apr. 2, 2012 (Docket # 14).

denied Tai-Fatt's application, R. 38–41, and Tai-Fatt subsequently requested a hearing before an administrative law judge ("ALJ"), R. 42.

On October 15, 2003, Tai-Fatt appeared pro se at a hearing before an ALJ.  R. 18–35.  In a decision issued October 29, 2003, the ALJ found that Tai-Fatt was not disabled within the meaning of the Social Security Act during the coverage period at issue, December 1987 through December 1991.  R. 12–15.  On November 19, 2004, the Commissioner's decision became final when the Appeals Council denied Tai-Fatt's request for review of the ALJ's decision.  R. 5–7.

Tai-Fatt filed a civil action on November 23, 2004 challenging the Commissioner's decision.  See Complaint, filed Nov. 23, 2004 (Docket # 1 in 04 Civ. 9274).  On November 30, 2005, this Court issued an opinion remanding Tai-Fatt's case and directing the Commissioner to consider evidence Tai-Fatt submitted to the Appeals Council that he had not submitted to the ALJ, to make an inquiry into the foundations of certain opinions rendered by Tai-Fatt's treating physicians, and to elicit testimony from Tai-Fatt as to which impairments he regarded as disabling during the coverage period.  See Tai-Fatt v. Barnhart, 2005 WL 3206552, at *12–13 (S.D.N.Y. Nov. 30, 2005).

On remand, Tai-Fatt testified pro se at a hearing before the ALJ.  See R. 510–46.  On April 28, 2006, the ALJ issued a decision denying disability.  See R. 497–509.  Tai-Fatt appealed the ALJ's ruling, but the Appeals Council declined to accept jurisdiction over the case.  R. 466–69.  On July 21, 2008, Tai-Fatt initiated an action challenging the Commissioner's decision.  See Complaint, filed July 17, 2008 (Docket # 1 in 08 Civ. 6397).  By stipulation of the parties, the District Court remanded the case to the Commissioner on December 18, 2008.  R. 483A–B.

Following the remand, an ALJ held an additional hearing on February 3, 2010 at which Tai-Fatt testified.  See R. 1191–216.  The ALJ issued a decision finding that Tai-Fatt was not

2

disabled at any time prior to December 31, 1991.  R. 667–79.  The Appeals Council declined

jurisdiction of Tai-Fatt's appeal.  R. 656–58.  Tai-Fatt thereafter brought the instant action

challenging the Commissioner's denial of benefits.  See Complaint, filed Dec. 21, 2011 (Docket

# 1).

On March 15, 2012, Tai-Fatt moved for judgment on the pleadings.  See Motion on the

Pleading Reversal Secretary [sic] Decision, filed Mar. 15, 2012 (Docket # 12) ("Tai-Fatt

Mem.").  On May 3, 2012, the Commissioner cross-moved for judgment on the pleadings.

See Notice of Motion, filed May 3, 2012 (Docket # 20); Defendant's Memorandum of Law in

Opposition to Plaintiff's Motion for Judgment on the Pleadings and in Support of Defendant's

Motion for Judgment on the Pleadings, filed May 3, 2012 (Docket # 21) ("Comm'r Mem.").

Tai-Fatt replied to the Commissioner's Motion.  See Affirmation in Opposition, filed June 4,

2012 (Docket # 24) ("Tai-Fatt Reply").  The Commissioner submitted a reply.  See Reply

Memorandum of Law in Support of the Defendant's Motion for Judgment on the Pleadings, filed

June 22, 2012 (Docket # 25) ("Comm'r Reply").

     B.    Evidence Presented Before the ALJ

Because the only issue in this case is whether Tai-Fatt was disabled between December

1987 and December 1991, we summarize the hearing record only insofar as it may plausibly be

viewed as relating to this period.

     1.    Tai-Fatt's Testimony

The following facts are taken from Tai-Fatt's testimony at the hearings before the ALJ

and from other statements made by Tai-Fatt contained in documents in the record.

Tai-Fatt, who is now a United States citizen, was born in Kingston, Jamaica, on October

13, 1945.  R. 30.  He came to the United States in 1965 and served in the United States military

from 1968 to 1969.  R. 30–31.  After his service in the military, he began seeking treatment due to "pain and disability."  R. 25.  Tai-Fatt worked as a window display person at trade shows from 1969 to 1985, and again for a period in 1987.  R. 25, 90.  His job as a display person involved assembling displays and furniture for exhibitors.  R. 80–81.  Tai-Fatt earned a Bachelor of Arts degree in Humanities in 1999.  R. 501.

Tai-Fatt visited multiple doctors after his military service ended, and in 1981 went to the Veterans Administration (now the United States Department of Veterans Affairs) ("VA") for medical treatment.  R. 25.  He saw several private doctors after 1981, but has no medical records of such treatment and testified that those doctors are all deceased.  See R. 26.  At a visit to the VA in 1981, he was diagnosed with diabetes, and was told to watch his diet.  R. 26–27.  He did not follow the doctor's directions to maintain a healthy diet because he did not know much about diabetes.  R. 27.  In the late 1980s and early 1990s, he would feel "good one moment" and then a moment later he would feel "weakness," almost "[n]o energy whatsoever," "blurry vision," and "dizziness" from the diabetes.  R. 27.  Tai-Fatt also testified that he has hearing problems related to his job as a demolition sergeant in the military, but did not receive a hearing aid from the VA until 1994 or 1995.  R. 28.

In the early 1980s, Tai-Fatt began experiencing depression, and then in 1985, his body "was going bad."  R. 25, see R. 29.  "[F]amily problems" developed, he divorced from his wife, lost his family, and became homeless in the mid-1980's.  R. 24, 32–33, 1210.  By 1987, he had completely stopped working and was homeless through the end of 1991.  R. 20, 24–25, 32–33, 1208–10, 1214.  Eventually, he acquired a residence, as evidenced by the fact that Tai-Fatt testified he has been living with his fourth wife of twelve years, R. 30, 204, 1211–12.  He testified that in or around 1987 he owned his own business but ceased working there because he

4

"couldn't keep up with [the] business" because of the "pressure and stress there from [his] ailments."  R. 1208–09.  Tai-Fatt testified that the combination of the following issues in particular precluded him from working: orthopedic problems with his foot, a hernia, surgery, his hearing, and family problems.  R. 1210.  As to why he could endure these problems prior to 1987 sufficiently to work, but could not endure them after 1987, Tai-Fatt testified that they "just started to get worse."  R. 1210.

Although Tai-Fatt testified that he had experienced depression and disability since the early 1980s, he received no emergency room treatment during the coverage period, and only began receiving treatment for his depression in 2003.  R. 29, 1211.  Tai-Fatt testified at the February 2010 hearing that he did not seek mental health treatment during the coverage period because he was embarrassed and did not want to be regarded as "crazy" for seeking such treatment.  R. 1211.  However, he had previously testified at the October 2003 hearing that he had sought treatment for depression from a VA medical center ("VAMC") in 1981 or 1982, but the VAMC from which he sought help turned him away.  See R. 29 ("I would say the depression went back as far as 1981, '82 when I tried to get help [at a VAMC] but no one helped me."); id. ("I never even knew I could go to the Veterans Administration . . . . because they – when I went in '81, they turned me down.").

Tai-Fatt testified that he did not receive medical treatment during the coverage period because he was homeless, had no money, and knew nothing about Social Security disability.  R. 24.  The only medical record dated prior to 1991, the last year of the coverage period, that Tai-Fatt submitted to the Commissioner was a benefits determination by the VA in 1981.  R. 126; see also R. 22.  That document indicates that the VA determined in 1981 that Tai-Fatt was "less than 10 percent disabl[ed]" and that the VA would not pay him any benefits.  R. 126.  The

record indicates that the VA currently lists Tai-Fatt as 90 percent disabled, although it pays him at the 100 percent disability rate.  R. 239.  His current disability is based on "unemployability" due to medical impairments, including depression and various orthopedic injuries.  R. 28–29, 242–44.

2.   <u>Records Relating to Tai-Fatt's Medical Condition</u>

Beginning in 1994, Tai-Fatt began receiving medical treatment from various VAMCs.  R. 82-83.  Virtually all of the treatment in the record submitted to the SSA occurred at various VAMCs.  Tai-Fatt claims his first visit to a VAMC was in January 1994.  R. 82.

a.   <u>Orthopedic Conditions</u>

The oldest record of treatment is a November 20, 1994, document referring to a left-foot x-ray at the Manhattan VAMC.  R. 131.  The x-ray revealed Tai-Fatt's left foot had a healed metatarsal[3] fracture and a right knee chondromalacia[4] secondary to favoring his right leg.  R. 131.  He was given strengthening exercises, range of motion exercises, and nonsteroidal anti-inflammatory drugs.  R. 131.  A follow up examination on June 14, 1995 revealed that Tai-Fatt continued to have left foot pain and right knee pain secondary to favoring his right leg while walking.  R. 131.  On December 20, 1995, he received a prescription for orthopedic shoes with a metatarsal pad.  R. 135.

On May 13, 1996, a magnetic resonance imaging ("MRI") scan of Tai-Fatt's right knee revealed an irregularity in the cartilage and degeneration in the medial meniscus.  R. 134.

---

[3]  The "metatarsal" bones are the five long bones in the foot connected to the toes, articulating from the toes towards the heal.  <u>See</u> <u>Stedman's Medical Dictionary</u> 224, Diagram A13 (27th ed. 2000) (hereinafter "<u>Stedman's</u>").

[4]  "Chondromalacia" is a "[s]oftening of any cartilage."  <u>Stedman's</u> at 341.

During an examination in January 1997, Tai-Fatt complained of a thirty-year history of left foot pain, and the treating physician's impression was of an old fifth-metatarsal fracture with calcification and possible tendinitis.  R. 310–11.  Tai-Fatt continued to complain of foot and knee pain at an examination on February 5, 1997.  R. 139.  Tai-Fatt was prescribed medication and various therapies, including exercise.  R. 139, 313, 328.  Tai-Fatt said that he could walk "unlimited distances" and ascend/descend stairs without difficulty.  R. 313.

At a VA evaluation conducted by Dr. Kuchment on August 12, 1997, and approved by Dr. Ores on August 18, 1997, Tai-Fatt indicated that he was able to walk up to three-quarters of a mile while using a right knee brace, and required no assistive devices.  R. 263.  On examination, he walked normally.  R. 263.  Dr. Kuchment's diagnosis was degenerative joint disease of the right knee and "status post old left foot injury."  R. 263.  In Dr. Kuchment's opinion, Tai-Fatt's problem with his right knee was "related to his left foot injury which caused the patient[] to favor left lower extrmities [sic] putting excessive stress on his right lower extremities."  R. 263.  On September 17, 1997, Tai-Fatt complained of intermittent right knee pain but reported an ability to engage in "unlimited ambulation."  R. 140.  Similarly, although he complained of foot pain at a December 1997 exam, he was able to walk without difficulty and had full motor strength.  See R. 345 (rating his motor strength at 5 out of 5).

The record reflects various visits to the VA between 1998 and 2000 – most of which resulted in reports of Tai-Fatt's complaints of left and right knee and/or ankle pain, and indicating certain limitations in his mobility.  See, e.g., R. 144, 154, 356, 365, 383, 388–89.

In a report dated January 29, 2001, Dr. Behr wrote a detailed analysis of Tai-Fatt's condition after reviewing his earlier medical records, including his military records.  R. 179–82.  Dr. Behr reported that the military records revealed fractures to the second and fifth metatarsal

7

bones on Tai-Fatt's left foot, but did not reveal any injuries to his left knee or right ankle at the time of his original injury in 1968.  R. 179.  Still, Tai-Fatt told Dr. Behr that the left knee and right ankle pain resulted from his service injury.  R. 179.  The report indicated that Tai-Fatt "walks slowly, deliberately with no list or tilt but with a limp due to holding his knees stiff."  R. 180.  Dr. Behr's diagnosis included an old fracture of the left foot, "osteochondritis dessicans [sic]"[5] of the right ankle and left femur, a cyst of the right calcaneal bone,[6] and a small ganglion cyst at the talonavicular joint[7] towards the back of his body.  R. 182.  In a typewritten note that is crossed out, Dr. Behr said it was "as likely as not that these conditions are proximally due to the service connected right knee condition"; a handwritten notation, "changed in computer," is written next to the crossed-out text.  R. 182.  At a September 2002 clinic visit, Tai-Fatt had no knee pain and no tenderness or instability.  R. 406.

On January 12, 2003, an MRI of the lumbar spine showed mild degenerative arthritis with disc bulges, but no disc herniation.  R. 158–59, 282–83.  In a letter, dated February 13, 2003 and addressed "to whom it may concern," Dr. Hedayatnia, the director of the Brooklyn VAMC's pain management clinic, wrote that Tai-Fatt had knee injuries and had experienced chronic lower back and right shoulder pain due to arthritis.  R. 291.  Dr. Hedayatnia opined, "this time I recommend that [Tai-Fatt] avoid lifting heavy objects and the jobs that need standing for long periods of time."  R. 291.

---

[5]  "Osteochondritis dissecans" refers to a "complete or incomplete separation of a portion of joint cartilage and the underlying bone . . . ."  Stedman's at 1282.

[6]  The "calcaneal bone" is the heel bone.  Stedman's at 266.

[7]  The "talonavicular" joint is the joint connecting the ankle, tibia, and fibula.  See Stedman's at 1784.

b.      Hearing

Tai-Fatt visited the VAMC audiology clinic in November and December 1994, and received a prescription for hearing aids on January 6, 1995.  See R. 132, 133, 301–02, 1189–90. On May 30, 1995, he was fitted with hearing aids.  R. 306.  After complaints from Tai-Fatt and subsequent testing, R. 271, 274, he was successfully fitted with new hearing aids in May 1997 and again in May 2003, R. 318, 435, 1187–88.

c.      Mental Health Treatment

Tai-Fatt first received treatment for his mental health through therapeutic counseling at a primary care clinic in 2003.  R. 162, 193–94, 196, 215, 217, 252, 459, 460, 1211.  He visited a post-traumatic stress disorder ("PTSD") clinic on January 8, 2003.  R. 252, 1135.  On October 10, 2003, he was found to be mildly depressed and to have "manageable" anxiety.  R. 459.  Tai-Fatt continued to be treated with medication for his PTSD through 2009.  See R. 873, 881, 896, 899, 905, 907, 914, 921–22, 926, 930, 938-39, 945, 951–53, 955, 966, 971, 988–89, 995, 1003–04, 1012, 1020–22, 1027, 1029, 1031, 1050, 1056, 1059, 1074, 1084–85, 1094, 1106, 1109.  With treatment, Tai-Fatt experienced some relief.  See R. 955, 966, 1029, 1059, 1074.

3.      VA Benefits Decisions

In a notice to Tai-Fatt dated December 9, 1981, the VA denied Tai-Fatt's claim for benefits.  R. 126, 245, 250.  The VA concluded that Tai-Fatt then endured a fractured left foot, a status-post right inguinal herniorrhaphy,[8] and hearing loss with tinnitus.[9]  R. 126, 245, 250.  The VA concluded that each of these injuries was service-connected, but that they were less than 10

---

[8]  "Inguinal herniorrhaphy" refers to a surgically repaired groin.  Stedman's at 814, 900.

[9]  "Tinnitius" is a condition of hearing noises, such as ringing, whistling, or booming sounds. Stedman's at 1838.

percent disabling. R. 126, 245, 250. The notice further indicated, however, that Tai-Fatt would be entitled to treatment for any service-connected disability. R. 126. The VA concluded he had diabetes mellitus, but that his diabetes was not incurred or aggravated by service. R. 126. Lastly, the VA determined that his "eye condition" was "not considered a disease or injury as these terms are used under the law." R. 126.

Tai-Fatt filed another claim for benefits on July 7, 1995, and on December 10, 1996, the VA found that as of August 25, 1995, Tai-Fatt was entitled to an "increased evaluation" for service-connected tinnitus, bilateral hearing loss, and a fracture of the left foot. R. 262. One year later, on December 9, 1997, the VA determined that he was entitled to increased benefits as of July 7, 1995 (the date of the original claim for an increase). R. 171. The decision also concluded that he had a 10 percent disability rating based on his service-connected osteoarthritis in his right knee and another 10 percent disability rating for a "residual scar, right inguinal herniorraphy [sic]." R. 171.

By letter dated December 29, 1997, the VA found Tai-Fatt's combined service-connected disability was 50 percent, although each disability was individually only 10 percent disabling. R. 129. The VA's notice reflected that Tai-Fatt was entitled to monthly benefits from the VA dating back to November 1, 1994. R. 127.

A VA decision dated June 12, 2001, indicated that Tai-Fatt's combined service-connected disabilities were 70 percent disabling, effective October 30, 2000. R. 167–70. A VA decision dated August 8, 2003, indicated that the VA increased its evaluation of Tai-Fatt's depressive disorder from 30 percent to 50 percent disabling, and it was determined that he was entitled to the 100 percent rate because he was unable to work as of March 31, 2003. R. 238–44. The VA's decision was based on Dr. Fine's report that "his inability to work, related to his major

10

depression and anxiety[,] is integrally connected and indeed caused by his long term orthopedic injuries and ear injuries which occurred in the military, and which have resulted in severe and chronic pain and inability to do his work, which is creating window displays."  R. 242.  The notice indicated that Tai-Fatt would receive $2,318 in monthly payments as of April 1, 2003.  R. 238.

4.    Letters and Opinions of VA Physicians

Several letters in the record from Tai-Fatt's treating physicians seem to have been written for use in determining Tai-Fatt's eligibility for VA benefits and/or Social Security benefits.  In an undated letter, Dr. Ulises Militano wrote that Tai-Fatt has had pain in his right knee and right ankle "for some time.  It is probable that this ankle pain is secondary to his knee pain as his gait would be thrown off [from] the knee pain resulting in abnormal loading of the right ankle."  R. 164.

In another letter addressed "to whom it may concern" and dated October 26, 2000, Dr. Nickson wrote that Tai-Fatt's service-related injury in 1968 affected his gait and caused the subsequent injury to his left knee, and added, "[p]lease assist him in any way with VA related benefits."  R. 165, 645, 762.  On January 16, 2003, Dr. Nickson wrote another note indicating that despite his "valiant efforts to return to the workforce, Mr. TaiFatt [sic] has been unable to maintain employment.  Please assist him in any way possible to achieve appropriate benefits." R. 166.

In a note dated February 4, 2002, Dr. Ores wrote that Tai-Fatt had a service-connected left foot injury and degenerative disease of the right knee.  R. 465, 764.  He also indicated that Tai-Fatt had impaired hearing, diabetes mellitus, and a hernia.  R. 465, 764.  Dr. Ores opined that "[d]ue to Mr. Tai-[F]att's disabilities, he has not been able to work from 1987 to present doing

any work." R. 764.  No explanation is given for this conclusion.  At the hearings before the ALJ,

Tai-Fatt testified that Dr. Ores first treated him in 1981 for metatarsal pain, R. 1199–1201, and

that Dr. Ores saw him "a couple more times" thereafter in the 1980s, R. 1202, until Tai-Fatt

began seeing a "subordinate" of Dr. Ores's instead, R. 1200, 1202.  It is unclear from the record

whether Dr. Ores examined or treated Tai-Fatt again after these occasions in the 1980's.  The

record indicates that Tai-Fatt saw Dr. Ores again in 2004, "[b]ut not officially on a visit."  R.

1203.  The 2002 letter that Dr. Ores wrote does not indicate whether Dr. Ores had examined or

treated Tai-Fatt in conjunction with the writing of that letter.  See R. 465, 764.  Dr. Ores did

approve an evaluation of Tai-Fatt in 1997, however.  R. 263.

Dr. Navid wrote a letter dated August 4, 2004, addressed "to whom it may concern,"

which indicated that she had treated Tai-Fatt in the primary care clinic since August 2003.

R. 464.  She reported that Tai-Fatt had a service-connected disability due to a left foot injury,

depression, impaired hearing, diabetes, and degenerative disease in both knees confirmed by x-

ray.  R. 465.  Dr. Navid stated that "[b]ecause of these conditions [Tai-Fatt] has been unable to

do any type of work from 1987 to the present."  R. 464.  On December 14, 2005, Dr. Navid

wrote that Tai-Fatt's disabilities included a left foot injury, degenerative spinal disease,

"impaired hearing, tinnitus, diabetes mellitus, right inguinal hernial and a neuroma of the skin."

R. 648, 760.  Dr. Navid opined that Tai-Fatt was unable to work from 1987 to 1991.  R. 648,

760.  Dr. Navid wrote another letter on April 21, 2006, which indicated that Tai-Fatt's condition

was ostensibly unchanged from the prior visit and repeated that Tai-Fatt was not capable of

performing work from 1987 to 1991.  R. 655.  On May 5, 2006, Dr. Navid reiterated the

statements contained in her prior letters.  She added that Tai-Fatt had polyuria, polydispia, and

fecal incontinence from 1987 to 1991, which may have been caused by uncontrolled diabetes.

She concluded that these problems made Tai-Fatt incapable of working.  R. 758.  Dr. Navid also

opined that Tai-Fatt has had PTSD since he left military service in 1969, that he has abnormal

gait and bilateral foot pain caused by toe fractures in 1968, and that he has had tinnitus and

bilateral knee pain since the 1960s.  R. 758.

Dr. Sabrina Felson, who served as Tai-Fatt's primary care provider beginning in August

2006, see R. 756, 808, 1212–14, wrote two letters, addressed "to whom it may concern" and

dated November 6, 2008 and August 31, 2009, which stated that Tai-Fatt was unable to work

from 1987 to 1991 because of the following conditions: diabetes, polyuria,[10] polydipsia,[11] and

fecal incontinence, R. 756, 808.  Dr. Felson also wrote that Tai-Fatt's diabetes is "complicated

by paraesthesias,[12] hyperlipidemia,[13] hypertension, sensorineural hearing loss, chronic tinnitus,

and low back pain."  R. 756, 808.  She noted that Tai-Fatt was receiving treatment for PTSD as

of August 31, 2009.  R. 808.

Dr. Jeffrey Fine, Tai-Fatt's treating psychiatrist, wrote multiple letters on Tai-Fatt's

behalf.  On June 1, 2005, Dr. Fine wrote that he had been treating Tai-Fatt for PTSD, and that

Tai-Fatt had a full range of PTSD symptoms.  R. 654.  Treatment had ameliorated some of his

symptoms, but even with treatment, Dr. Fine opined that Tai-Fatt is incapable of working.  R.

654.  On February 3, 2006, Dr. Fine wrote a letter "to whom it may concern" and explained that

---

[10]  "Polyuria" is a condition involving "[e]xcessive excretion of urine," which causes a "profuse and frequent" urge to urinate.  Stedman's at 1426.

[11]  "Polydipsia" is a condition of prolonged, excessive thirst.  Stedman's at 1420.

[12]  "Paraesthesias" are "abnormal sensation[s], such as of burning, pricking, tickling or tingling." Stedman's at 1316; see also id. at 1309.

[13]  "Hyperlipidemia" is an abnormally high concentration of fat in the circulating blood.  See Stedman's at 851, 1019.

Tai-Fatt's condition was unchanged from June 1, 2005.  R. 653.  On August 3, 2006, Dr. Fine

wrote in a letter "to whom it may concern" that Tai-Fatt exhibited a full range of PTSD

symptoms: "nightmares, flashbacks, insomnia, hypervigilance, mood lability,

anger, . . . depression, . . . social isolation[,] and interpersonal difficulties."  R. 666.  Dr. Fine

wrote that "[a]ll of these symptoms have been present to variable degrees since he left the

military service in 1969" and that Tai-Fatt was unable to work as a result of his ailments.  R.

666, 754, 815, 819.  Dr. Fine does not cite a source for his views.  On November 7, 2008, Dr.

Fine wrote that Tai-Fatt's condition was essentially unchanged since August 3, 2006.  See R.

665, 753, 814, 818.  On October 20, 2009, Dr. Fine wrote that Tai-Fatt continued to undergo

mental health treatment and that he "remain[ed] quite symptomatic."  R. 813, 817.  Dr. Fine also

completed a questionnaire, dated October 18, 2009, in which he indicated that Tai-Fatt had

marked impairments in his abilities to understand and remember complex instructions; carry out

complex instructions; make complex, work-related judgments; and interact appropriately with

the public.  R. 809–11.  Dr. Fine indicated that Tai-Fatt had moderate or mild impairments in

other aspects of daily functioning.  See R. 809–11.

On August 27, 2009, Dr. Shuang Troy wrote a letter "to whom it may concern" on behalf

of Tai-Fatt indicating that he continued to suffer from PTSD and receive treatments with respect

thereto.  R. 807, 816, 820.  Dr. Troy opined that Tai-Fatt remained significantly disabled and

unable to work.  R. 807, 816, 820.

C.  The ALJ's Decision

On February 16, 2010, the ALJ issued a decision in which he determined that Tai-Fatt

was not entitled to disability insurance benefits.  See R. 667–79.  First, he concluded that Tai-

Fatt's disability insurance coverage ended on December 31, 1991, and thus that Tai-Fatt had to

establish disability before that date.  R. 675.  The coverage period, the ALJ concluded, was from

December 1, 1987 through December 31, 1991.  R. 675.  The ALJ next determined that Tai-Fatt

had not engaged in substantial gainful activity during the coverage period.  R. 675.  The ALJ

found that Tai-Fatt had the following medically determinable impairments throughout the

coverage period: "bilateral sensorineural hearing loss; a right inguinal herniorrhaphy scar; status-

post fractures of the second and fifth left metatarsals; and non-insulin-dependent diabetes

mellitus."  R. 675.  However, the ALJ concluded that these impairments, individually or

combined, did not significantly limit his ability to perform basic work-related activities for 12

consecutive months.  R. 675–78.  As a result, the ALJ concluded Tai-Fatt was not eligible for

Social Security disability benefits.  R. 678–79.

> D.    The Appeals Council's Decision Not to Review

On March 9, 2010, Tai-Fatt requested that the Appeals Council review the ALJ's

decision.  R. 659.  In support of his request for appellate review, Tai-Fatt submitted several

documents containing the opinions of his treating physicians that had already been placed into

the record.  See R. 660–66.  The Appeals Council explained that these documents were

cumulative of evidence already in the record and declined jurisdiction over Tai-Fatt's case.  R.

656.

## II.    APPLICABLE LEGAL PRINCIPLES

> A.    Scope of Judicial Review under 42 U.S.C. § 405(g)

A court reviewing a final decision by the Commissioner must determine whether the

Commissioner has applied the correct legal standard and whether the decision is supported by

substantial evidence.  See, e.g., Burgess v. Astrue, 537 F.3d 117, 127 (2d Cir. 2008); Acierno v.

Barnhart, 475 F.3d 77, 80–81 (2d Cir.) (citing Pollard v. Halter, 377 F.3d 183, 188 (2d Cir.

2004)) (additional citation omitted), cert. denied, 551 U.S. 1132 (2007); Tejada v. Apfel, 167 F.3d 770, 773 (2d Cir. 1999); see generally 42 U.S.C. § 405(g) ("The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . ."). Substantial evidence is "'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consol. Edison Co. v. N.L.R.B., 305 U.S. 197, 229 (1938)); accord Burgess, 537 F.3d at 127–28; Matthews v. Leavitt, 452 F.3d 145, 152 n.9 (2d Cir. 2006); Shaw v. Chater, 221 F.3d 126, 131 (2d Cir. 2000).

"Even where the administrative record may also adequately support contrary findings on particular issues, the ALJ's factual findings must be given conclusive effect so long as they are supported by substantial evidence." Genier v. Astrue, 606 F.3d 46, 49 (2d Cir. 2010) (citation and internal quotation marks omitted). Thus, "[i]f the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists." Johnson v. Astrue, 563 F. Supp. 2d 444, 454 (S.D.N.Y. 2008) (citing Alston v. Sullivan, 904 F.2d 122, 126 (2d Cir. 1990) ("Where there is substantial evidence to support either position, the determination is one to be made by the factfinder.")). The Second Circuit has characterized the substantial evidenced standard as "a very deferential standard of review — even more so than the 'clearly erroneous' standard." Brault v. Soc. Sec. Admin., Com'r, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted); accord Johnson, 563 F. Supp. 2d at 454 ("The role of the reviewing court is therefore quite limited and substantial deference is to be afforded the Commissioner's decision.") (citations and internal quotation marks omitted). The "substantial evidence" standard means that "once an ALJ finds facts, [a court] can reject those facts only if a reasonable factfinder would have to conclude

16

otherwise."  Brault, 683 F.3d at 448 (emphasis in original) (citation and some internal

punctuation omitted).

    The Commissioner's determination cannot stand, however, if the decision violates the

"treating physician rule."  Under that rule, an ALJ must accord "a measure of deference" to the

medical opinions of a social security claimant's treating physician.  Halloran v. Barnhart, 362

F.3d 28, 31 (2d Cir. 2004).  The ALJ must give "controlling weight" to a treating physician's

medical opinion as to the nature and severity of a claimant's impairments if the opinion "is

well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not

inconsistent with the other substantial evidence in [the claimant's] case record."  20 C.F.R.

§ 404.1527(c)(2); accord Morales v. Astrue, 2012 WL 414236 (S.D.N.Y. Feb. 9, 2012) (citation

omitted).  The ALJ need not give controlling weight to the opinions of a treating physician that

are inconsistent with other substantial evidence in the record, Veino v. Barnhart, 312 F.3d 578,

588 (2d Cir. 2002) (citations omitted), including "the opinions of other medical experts,"

Halloran, 362 F.3d at 32, since "[g]enuine conflicts in the medical evidence are for the

Commissioner to resolve," Veino, 312 F.3d at 588 (citing Richardson, 402 U.S. at 399); accord

Burgess, 537 F.3d at 128.  If the ALJ rejects the opinion of a treating physician, the ALJ must

"provide good reasons for the weight [the ALJ] gives to the treating source's opinion."

Halloran, at 32–33 (citing Schaal v. Apfel, 134 F.3d 496, 505 (2d Cir. 1998)) (internal quotation

marks omitted).  Courts "do not hesitate to remand when the Commissioner has not provided

'good reasons' for the weight given to a treating physician[']s opinion and [should] continue

remanding when [they] encounter opinions from ALJ's that do not comprehensively set forth

reasons for the weight assigned to a treating physician's opinion."  Id. at 33; see also Snell v.

Apfel, 177 F.3d 128, 133 (2d Cir. 1999) (citing Schaal, 134 F.3d at 505) ("Failure to provide

'good reasons' for not crediting the opinion of a claimant's treating physician is a ground for remand.").

B.      Standard Governing Evaluation of Disability Claims by the ALJ

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To evaluate a Social Security claim, the Commissioner is required to examine: "(1) the objective medical facts; (2) diagnoses or medical opinions based on such facts; (3) subjective evidence of pain or disability testified to by the claimant or others; and (4) the claimant's educational background, age, and work experience." Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983) (per curiam) (citations omitted). Disability decisions of "another governmental agency" should be given "some weight[,] and should be considered" by the SSA in making its own disability determination. Cutler v. Weinberger, 516 F.2d 1282, 1286 (2d Cir. 1975).

Regulations issued pursuant to the Social Security Act set forth a five-step process that the Commissioner must use in evaluating a disability claim. See 20 C.F.R. § 404.1520(a)(4); see also Curry v. Apfel, 209 F.3d 117, 122 (2d Cir. 2000) (describing the five-step process), superceded by statute on other grounds, 20 C.F.R. § 404.1560(c)(2). First, in evaluating the claim, the Commissioner must determine whether the claimant is currently engaged in any

"substantial gainful activity."  20 C.F.R. § 404.1520(a)(4)(i).  Second, if the claimant is not

engaged in substantial gainful activity, the Commissioner must decide if the claimant has a

"severe medically determinable physical or mental impairment," 20 C.F.R. § 404.1520(a)(4)(ii),

which is an impairment or combination of impairments that "significantly limits [the claimant's]

physical or mental ability to do basic work activities," 20 C.F.R. § 416.920(c).  Third, if the

claimant's impairment is severe and is listed in 20 C.F.R. Part 404, Subpt. P, App. 1, or is

equivalent to one of the listed impairments, the claimant must be found disabled.  20 C.F.R.

§ 404.1520(a)(4)(iii).  Fourth, if the claimant's impairment is not listed or is not equal to one of

the listed impairments, the Commissioner must review the claimant's residual functional

capacity to determine if the claimant is able to do work he or she has done in the past, i.e., "past

relevant work."  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant is able to do such work, he or

she is not disabled.  Id.  Finally, if the claimant is unable to perform past relevant work, the

Commissioner must decide if the claimant's residual functional capacity permits the claimant to

do other work.  20 C.F.R. § 404.1520(a)(4)(v).  If the claimant cannot perform other work, he or

she will be deemed disabled.  Id.  The claimant bears the burden of proof on all steps except the

final one: that is, proving that there is other work the claimant can perform.  Curry, 209 F.3d at

122 (citations omitted).

III.   <u>DISCUSSION</u>

Tai-Fatt makes the following arguments:  (1) the ALJ improperly failed to give controlling weight to the opinions of Tai-Fatt's treating physicians, Tai-Fatt Mem. at 27; (2) the ALJ's decision was not supported by substantial evidence, <u>id.</u> at 28; (3) the ALJ improperly evaluated Tai-Fatt's residual functional capacity, <u>id.</u> at 29; (4) the ALJ's opinion did not comport with the directives of this Court on remand, <u>id.</u> at 42; and (5) the ALJ did not consider all the evidence in the record or the combined effects of Tai-Fatt's impairments, <u>see id.</u> at 28.  As explained below, these arguments must be rejected.

A.   <u>Opinions of Treating Physicians</u>

 The ALJ considered the opinions of Tai-Fatt's treating physicians that Tai-Fatt was disabled and unable to work from 1987 to 1991, but found them not "persuasive to the slightest degree."  R. 678.  The ALJ found that these opinions both were inconsistent with record evidence and lacked corroborating, objective medical evidence to support them.  <u>See</u> R. 678.

The ALJ noted that no contemporaneous medical records exist to corroborate a finding that Tai-Fatt was either fully or partially disabled from 1987 to 1991.  R. 676, 678.  All of Tai-Fatt's treating physicians' opinion letters were rendered more than a decade after the period in question, and none of the doctors treated or examined Tai-Fatt during the disability period.  The opinions do not rely on contemporaneous medical records; rather they appear to rely principally on Tai-Fatt's own statements regarding his condition during the coverage period.  The most temporally proximate examinations of Tai-Fatt by any of the physicians who proffered retrospective opinions were "a couple" of examinations by Dr. Ores conducted in 1981, approximately six years prior to the alleged disability onset date, R. 1199–1202, and Dr. Ores's

approval of an orthopedic evaluation of Tai-Fatt conducted by Dr. Kuchment in 1997, nearly six

years after the final date insured, R. 263.

Additionally, the ALJ noted various inconsistencies between the record evidence and the

treating physicians' conclusions that Tai-Fatt was disabled from 1987 to 1991.  The ALJ

observed that the physicians' opinions are undermined by the fact that Tai-Fatt did not seek

medical treatment during the period in question, although treatment was available to Tai-Fatt at

no expense at VAMCs.  R. 678.  Furthermore, the ALJ noted that no symptoms of the depression

and PTSD from which Tai-Fatt now evidently suffers were present in the examinations of Tai-

Fatt from 1994 until 2003, although the doctors opined that Tai-Fatt suffered severely from these

conditions from 1987 through 1991.  R. 678.  Nor does the record contain any indication that the

symptoms of mental impairment were present in any examination prior to the disability onset

date.  See R. 126.  The medical records indicate Tai-Fatt began experiencing significant mental

health limitations only in 2003, nearly twelve years after the final date insured.  Tai-Fatt has

given inconsistent testimony as to why he did not seek medical treatment for his mental

impairments until 2003 in light of his contentions that he was disabled long prior to then.  In the

February 2010 hearing before the ALJ, he testified that he had not sought treatment until 2003

because he was embarrassed.  R. 1211.  However, during an October 2003 hearing before the

ALJ, Tai-Fatt testified that he had sought mental health treatment as early as 1981 "but no one

helped [him]," including the VAMC which turned him away when he sought help.  R. 29.

The ALJ pointed out that as of Tai-Fatt's first VA examination in 1994, he only had

minimal orthopedic issues at the time, and indeed even as late as September 1997, VA records

indicated he had a good physical status and that he functioned independently in his daily

activities.  R. 678.  Lastly, the ALJ noted that Tai-Fatt earned a Bachelor of Arts degree in

Humanities in 1999, which "indicates an adequacy of mental functioning which is inconsistent with contentions of profound psychiatric compromise at a point in time which is well after the date last insured."  R. 678.

The VA's 1981 benefits determination, combined with the fact that Tai-Fatt worked for several years thereafter with a fractured left foot, herniorrhaphy, hearing loss, and diabetes mellitus are inconsistent with the opinions of Dr. Ores, <u>see</u> R. 465,764; Dr. Navid, <u>see</u> R. 648, 655, 758, 760; and Dr. Felson, <u>see</u> R. 756, 808, 1212–14, that some or all of those conditions precluded Tai-Fatt from working.  Likewise, the absence of evidence of any mental health problem in Tai-Fatt's record prior to 2003 substantially undermines the opinions of Dr. Fine that depression and PTSD prevented Tai-Fatt from sustaining employment during the coverage period.  <u>See</u> R. 653, 654, 666, 754, 815, 819.

The foregoing were "good reasons" advanced by the ALJ to disregard the unsourced, conclusory, and unexplained opinions of Tai-Fatt's treating physicians that he could not work from 1987 to 1991.  The ALJ's decision therefore did not violate the "treating physician rule."

B.   <u>Whether Substantial Evidence Supported the ALJ's Decision</u>

As noted, the record lacks evidence contemporaneous with the coverage period. However, in a VA benefits determination dated December 9, 1981, the VA found that Tai-Fatt then suffered from a left foot fracture, status-post right inguinal herniorrhaphy, hearing loss with tinnitus, and diabetes mellitus.  R. 126.  Accordingly, the ALJ concluded that Tai-Fatt suffered from all of these impairments throughout the insurance period, except that the fractured foot was "status-post."  R. 675.  The VA benefits determination constitutes substantial evidence for this finding.

22

The ALJ concluded that these conditions did not significantly limit Tai-Fatt's ability to perform basic work-related activities for a full year.  R. 675.  The VA benefits determination supports the ALJ's finding that the fracture, hernia, and hearing impairment were not sufficiently severe, as the VA determined that they were jointly "less than 10% disabling."  R. 126.  Notably, there was significant medical evidence that Tai-Fatt could walk without difficulty several years after the coverage period, see, e.g., R. 263, 313, 345.  Likewise, substantial evidence supported the ALJ's finding that Tai-Fatt's diabetes, in conjunction with his other physical conditions, was not sufficiently debilitating, as Tai-Fatt maintained gainful employment from 1980 to 1985, R. 25, and worked part-time in 1987, R. 90.

The ALJ found that Tai-Fatt did not have a medically determinable mental impairment prior to the date last insured.  R. 675.  Aside from Tai-Fatt's testimony, the only evidence in the record in support of Tai-Fatt's contention that he had a mental impairment during the coverage period were the retrospective and conclusory opinions of the treating physicians.  As to Tai-Fatt's other physical conditions purportedly present from 1987 to 1991 – such as his polyuria, polydispia, and fecal incontinence – the retrospective opinions of the treating physicians constitute the only evidence in the record of their existence at the time.  Yet none of these physicians actually treated Tai-Fatt during this period.   As discussed, the ALJ was justified in disregarding these opinions of Tai-Fatt's treating physicians.  Tai-Fatt bears the burden of proving that he had a severely impairing mental disability.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982) ("The claimant bears the initial burden of showing that his impairment prevents him from returning to his prior type of employment."); see also 42 U.S.C. § 423(d)(5)(A) ("An individual shall not be considered to be

under a disability unless he furnishes such medical and other evidence of the existence thereof . . . .").

Because Tai-Fatt's subjective complaints alone as to his condition are not a sufficient basis for sustaining a finding of disability, see, e.g., Cangelosi v. Chater, 1996 WL 663161, at *4 (E.D.N.Y. Nov. 5, 1996); 20 C.F.R. §§ 404.1529(a), 416.929(a); because the "failure to present any medical evidence from [the coverage] period seriously undermines [a claimant's] contention that he was continuously disabled during that time," Arnone v. Bowen, 882 F.2d 34, 39 (2d Cir. 1989); because a disability finding must be based on actual "medical signs and findings, established by medically acceptable clinical or laboratory diagnostic techniques," 42 U.S.C. § 423(d)(5)(A); and because the ALJ was free to disregard the treating physicians' retrospective opinions, the ALJ's decision is supported by substantial evidence.

C.    Residual Function Capacity Assessment

Tai-Fatt also argues that the ALJ improperly evaluated Tai-Fatt's residual function capacity ("RFC").  See Tai-Fatt Mem. at 29.  The ALJ, however, did not conduct an assessment of Tai-Fatt's RFC, R. 675–78, and it was not erroneous for the ALJ to eschew an RFC analysis. If at any stage in the five-step process of evaluating a disability claim, an ALJ is able to determine that a claimant was either disabled or not disabled, such a finding ends the evaluation, and the ALJ need not proceed to subsequent steps.  See 20 C.F.R. § 404.1520(a)(4) ("If we can find that you are disabled or not disabled at a step, we make our determination or decision and we do not go on to the next step.  If we cannot find that you are disabled or not disabled at a step, we go on to the next step.").  Therefore, because the ALJ was able to conclude after step three that Tai-Fatt was not disabled during the coverage period, the ALJ did not need to proceed to step four to evaluate Tai-Fatt's RFC.

24

D.      Consistency of the ALJ's Opinion with the Remand Order

Tai-Fatt argues that the ALJ's decision did not comport with the directives of this Court on remand.  See Tai-Fatt Mem. at 42.  Specifically, Tai-Fatt objects that the ALJ "did not make appropriate inquiry to [Tai-Fatt's] physicians as directed" by this Court.  Id.

The Court's order of remand directed the Commissioner (1) to give consideration to the letters of Dr. Navid and Dr. Ores that had been submitted to the Appeals Council, but not to the ALJ; (2) to "make an appropriate inquiry of these physicians to determine the basis for their disability determinations;" and (3) to "obtain testimony from Tai-Fatt regarding which impairments he subjectively considered disabling during the coverage period."  See Tai-Fatt, 2005 WL 3206552, at *12–13.  The Court also added that "the ALJ is free to seek testimony, documents, or examinations with respect to any other area deemed relevant to Tai-[F]att's claim for benefits."  Id. at *13.

The ALJ complied with the Court's instructions.  The ALJ gave consideration to the opinions of Dr. Navid and Dr. Ores, as well as those of the other treating physicians.  See R. 678 (stating that he "carefully examined all of the retrospective VA physician opinions").  While he concluded that they were not due controlling weight, he was justified in doing so.  The record is also clear that the ALJ elicited testimony from Tai-Fatt as to which impairments he subjectively considered disabling during the coverage period.  See R. 1209–11.

The ALJ also made adequate inquiries into the foundations of the opinions of Dr. Navid, Dr. Ores, and Dr. Fine.  As of January 26, 2006, the ALJ had learned that Dr. Ores was no longer available at the VA.  R. 652, 678.  The ALJ obtained testimony from Tai-Fatt as to the history of his relationship with Dr. Ores.  See R. 1199–1204.  The ALJ also requested that Dr. Navid and Dr. Fine submit "all medical records and treatment notes from 12/1/87 and complete the attached

Medical Source Statement form(s)."  R. 765, 778.  In response, the VA sent the ALJ all of its

medical records on Tai-Fatt.  <u>See</u> R. 829–1190.  Dr. Fine completed the medical source

statement, <u>see</u> 809–11, but Dr. Navid did not, as she had already left the VA at that point, <u>see</u> R.

678.  The ALJ obtained testimony from Tai-Fatt into his treatment relationship with Dr. Fine and

Dr. Navid.  <u>See</u> 1204–06.  None of these physicians had actually treated Tai-Fatt during the

coverage period.  In these circumstances, the ALJ's actions were sufficient to comply with the

Court's instructions to make an "appropriate inquiry" of the physicians on remand.

      E.     <u>ALJ's Consideration of the Combined Effects of Tai-Fatt's Impairments</u>

Tai-Fatt appears to argue that the ALJ did not consider all of the evidence in the record or

the combined effects of his impairments.  <u>See</u> Tai-Fatt Mem. at 28 (arguing that the ALJ must

consider the "totality of the record" and "all the evidence in the record" in determining whether a

claimant can work).  However, the ALJ expressly indicated that he gave "careful consideration

of the entire record."  R. 675.  He also stated that he concluded that the "combination of [Tai-

Fatt's] impairments" did not significantly limit his ability to perform work-related activities for

12 consecutive months.  R. 675.

IV.     <u>CONCLUSION</u>

    For the foregoing reasons, Tai-Fatt's motion for judgment on the pleadings (Docket

# 12) is denied.  The Commissioner's motion for judgment on the pleadings (Docket # 20) is

granted.  The Clerk is requested to enter judgment and to close this case.

SO ORDERED.

Dated: October 1, 2012
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

Copies sent to:

Calvin O. Tai-Fatt
22 Manursing Avenue
Rye, New York 10580

John E. Gura, Jr.
Assistant United States Attorney
86 Chambers Street
New York, NY 10007